## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

**In re**  
**SEAN THOMAS HITE and**  
**MELINDA DALE HITE,**  
    **Debtors.**

Chapter 13

Case No. 15-51191

### MEMORANDUM DECISION

Before the Court is the chapter 13 trustee's objection to confirmation. ECF Doc. No. 22. The chapter 13 trustee, by counsel, objects under section 1325(b) of the Bankruptcy Code[1] on the grounds that the debtors have not allocated all of their disposable income towards payments to unsecured creditors. The debtors, Sean and Melinda Hite ("Sean and Melinda"), filed a brief asserting that their proposed chapter 13 plan complies with the disposable income requirements of section 1325(b). ECF Doc. No. 29. The chapter 13 trustee filed a brief in opposition to confirmation. ECF Doc. No. 33. On August 3, 2016, the Court held a hearing. Counsel for the chapter 13 trustee, Angela M. Scolforo ("trustee"), argued in support of the objection to confirmation, and Roland S. Carlton, Jr., argued on behalf of Sean and Melinda. At the conclusion of the hearing, the Court overruled the trustee's objection in an oral bench ruling. Emphasizing the potential importance of this decision on a number of active cases, the trustee asked the Court to issue a written opinion. The Court agreed, and its findings of fact and conclusions of law are memorialized in this Memorandum Decision.

### FINDINGS OF FACT

Sean and Melinda live with their severely disabled, twenty-year-old son, Christian. Christian is wheelchair-bound and has autism, cerebral palsy and Lennox-Gastaut syndrome, a

---

[1] Unless otherwise noted, all citations to code sections in this Memorandum Decision are to the U.S. Bankruptcy Code, as codified in 11 U.S.C. §§ 101 *et seq*.

rare and debilitating form of epilepsy. Because Christian is an adult, Sean and Melinda do not have a legal obligation to take care of him. The severity of Christian's disability makes him eligible to be placed in a hospital, nursing facility or other appropriate institution at the government's expense.

Caring for adults like Christian involves a high cost. A provision of the Social Security Act ("SSA") allows Medicaid to partner with state agencies and authorized organizations to provide funds ("Medicaid waiver benefits") for severely disabled adults like Christian who would otherwise be institutionalized ("qualified beneficiaries"). Medicaid waiver benefits allow qualified beneficiaries to be cared for in a family home setting ("Medicaid waiver program").[2] *See* 42 U.S.C. § 1396n(c) (outlining SSA's Medicaid waiver program). Sean and Melinda have chosen to personally care for Christian at home, and Public Partnership, LLC ("Public Partnership"), is the Virginia- and Medicaid-approved organization that pays the Medicaid waiver benefits for Christian's home care ("PP payments").[3] To summarize, Christian is a qualified beneficiary[4] who is eligible to receive a certain amount of Medicaid waiver benefits to cover the cost of home care services, которых his parents are personally providing.

Sean and Melinda include more than $2,500 in PP payments in their monthly budget, from which they propose to pay the trustee $842 each month in their chapter 13 plan.[5] Sch. I &

---

[2] An obvious financial benefit to the government is the fact that the Medicaid waiver program does not pay for a qualified beneficiary's room and board, an expense eliminated by the family home setting.

[3] Melinda is the named payee of PP payments, but this technicality is immaterial. Sean and Melinda both provide daily support services to their son. The Court will refer to the PP payments as being made to Sean and Melinda. Christian, like other qualified beneficiaries, does not receive any money from Public Partnership. Public Partnership determines what level of care benefits Christian qualifies for and pays the care provider—in this case his parents—for the care services. This sensible process reduces the risk of fraud and misappropriation of funds.

[4] The trustee agrees that Christian is a qualified beneficiary. ECF Doc. No. 33 at 2.

[5] Sean and Melinda report $2,502.66 from the PP payments on line 8f of Schedule I. In total, Sean and Melinda report a combined monthly income $5,361.93 on line 12. Sean and Melinda disclose monthly living

2

J, ECF Doc No. 18 at 27, 31; Am. Plan, ECF Doc. No. 36 at 2.  According to the trustee, the debtors receive approximately $3,200 per month from Public Partnership for Christian's monthly care.[6]  The trustee takes the position that all PP payments Sean and Melinda receive are part of their current monthly income and must be included in their disposable income calculation for their chapter 13 plan.  *See* § 101(10A) (defining current monthly income, in pertinent part, as "the average monthly income from all sources that the debtor receives . . . without regard to whether such income is taxable income"); § 1325(b)(2) (defining disposable income as "current monthly income received by the debtor . . . less [certain amounts]").  Sean and Melinda counter that none of the PP payments fall under the definition of current monthly income because these funds qualify as protected SSA benefits, which means they are also excluded from Sean and Melinda's projected disposable income during their chapter 13 applicable commitment period.[7]  *See* § 101(10A)(B) (excluding "benefits received under the Social Security Act" from the definition of current monthly income); *see also* § 1325(b)(2) (carving out "foster care payments" from disposable income).

Sean and Melinda are below the median income.[8]  Their applicable commitment period is thirty-six months, but Sean and Melinda propose a sixty-month plan during which they will pay the trustee a total amount of $50,170.  ECF Doc. No. 36 at 4; *see also* § 1325(b)(4) (setting

---

expenses on Schedule J totaling $4,519.92, resulting in a net monthly income of $842.01 on line 23c.  The trustee does not contest Sean and Melinda's expenses.

[6]     The trustee projects this figure from amounts reported from Melinda's Public Partnership pay advice document dated November 20, 2015, and submitted as Exhibit A to the trustee's brief.  ECF Doc 33-1 at 1.

[7]     Sean and Melinda must include some PP payments in their budget because they cannot propose a feasible plan otherwise.

[8]     The trustee originally asserted Sean and Melinda were above-median-income debtors, and thus would have an applicable commitment period of five years.  During oral argument at a preliminary hearing, the trustee acknowledged Sean and Melinda were below-median-income debtors even if all PP payments were included in their current monthly income calculation on Official Form 22C-1.

3

applicable commitment period of three years for below-median-income debtors). Out of the plan payments, the trustee will disburse a 20% dividend to unsecured creditors.[9]

The question before the Court is a limited one. The Court must decide whether debtors who are themselves caring for a qualified beneficiary in their home need to include all funds they receive through the Medicaid waiver program to make payments to their unsecured creditors. This bears repeating: the present issue concerns debtors who receive payments through a Medicaid waiver program because they live with and care for a qualified beneficiary in the same home.

## JURISDICTION

The Court has jurisdiction over Sean and Melinda's bankruptcy case by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a), the delegation made to this Court by Order of Reference from the District Court entered on December 6, 1994, and Rule 3 of the Local Rules of the United States District Court for the Western District of Virginia. At issue is whether Sean and Melinda have allocated all of their disposable income toward their payments to unsecured creditors pursuant to 11 U.S.C. § 1325(b). This matter is a "core" bankruptcy proceeding within the meaning of 28 U.S.C. § 157(b)(2)(L).

## ANALYSIS

"[I]f the Trustee or an unsecured creditor objects to confirmation . . . the plan must either fully pay the unsecured claim or provide that all the debtor's 'projected disposable income' to be received during the applicable commitment period will be applied to make payments to unsecured creditors under the plan." *Mort Ranta v. Gorman*, 721 F.3d 241, 250 (4th Cir. 2013)

---

[9] Sean and Melinda's total plan payments have not changed in the amended plan. The distribution to unsecured creditors increased to 20% because not all unsecured creditors filed claims by the bar date.

4

(citing section 1325(b)(1)).[10]  Here the trustee has objected to confirmation, which means Sean and Melinda must propose a plan that either pays all unsecured creditors in full or provides that the projected disposable income received during the applicable commitment period will be applied to make payments to unsecured creditors.  Because Sean and Melinda do not propose a plan that pays a 100% dividend to unsecured claims, they must provide all their projected disposable income to be received in their three-year applicable commitment period to make payments to their unsecured creditors.

So, if the trustee is correct and the entire $3,200 in PP payments is current monthly income and consequently projected disposable income, the Court may not confirm the plan unless it provides that all PP payments Sean and Melinda receive are applied to make payments to their unsecured creditors for a period of three years.[11]  In addition, the trustee asserts Sean and Melinda's 2015 federal tax refund is disposable income.  According to the trustee, because the PP payments are disposable income, Sean and Melinda's 2015 federal tax refund—which the parties agree is based in large part from taxes Sean and Melinda paid on the PP payments but were later refunded since these PP payments are excluded from taxation, *see infra* Part B—is disposable income.

---

[10]    The objection to confirmation under section 1325(b) is discretionary, unlike the requirements of section 1325(a).  *Compare* § 1325(b)(1) ("If the Trustee or the holder of an allowed unsecured claim objects . . . then the court may not approve the plan unless . . . (B) the plan provides that all of the debtor's projected disposable income . . . will be applied to make payments to unsecured creditors under the plan."), *with* § 1325(a) ("Except as provided in subsection (b), the court shall confirm a plan if [it meets the requirements of section 1325(a).]").

[11]    If Sean and Melinda receive $3,200 per month from Public Partnership and if the uncommitted $700 in PP payments is added to their plan payments for a period of thirty-six months, the result is a total base gross of $55,512.  The current base gross of Sean and Melinda's plan payments is $50,170.  It is logical that $5,342 in additional funds contributed to the plan will result in an increased distribution to unsecured creditors, but the Court makes no finding about the amount or extent this increase will have on a dividend to unsecured creditors in this case.  It is unclear from the record what portion of Sean and Melinda's 2015 federal tax refund is attributable to PP payments, but these funds, if also added to the total payments made into the plan, would result in a corresponding increase in the dividend to unsecured creditors.

5

For these reasons, the trustee requests the Court require Sean and Melinda to: (1) amend Official Form 22C-1[12] and Schedule I to include all income from Public Partnership, (2) amend Official Form 22C-1 and Schedule I to reduce the amount of tax liability by 1/12 of the 2015 federal tax refund, and (3) amend the plan to increase the disbursement to unsecured creditors. Tr.'s Br., ECF Doc. No. 33 at 10–11.

For chapter 13 debtors, the Bankruptcy Code defines "disposable income," in pertinent part, as "current monthly income received by the debtor . . . other than . . . foster care payments." § 1325(b)(2). The Bankruptcy Code defines "current monthly income" as "the debtor's average monthly income from all sources during the previous six months, excluding . . . 'benefits received under the Social Security Act.'" *Mort Ranta*, 721 F.3d at 251 (quoting section 101(10A)(B)). Benefits received under the SSA are thus excluded from current monthly income and respectively are not disposable income.

In the end, if the PP payments at issue are benefits received under the SSA they are excluded from current monthly income and by consequence excluded from disposable income. What is more, even if the PP payments do not qualify as benefits received under the SSA, they may nonetheless be excluded from Sean and Melinda's disposable income through section 1325(b)(2) if they are foster care payments.

The trustee raises several arguments for requiring Sean and Melinda to include all PP payments they receive for Christian's home care as disposable income to be paid toward their unsecured creditors. None of the trustee's arguments are persuasive. The Court will address them in turn.

---

[12] This form is titled "Chapter 13 Statement of Your Current Monthly Income and Calculation of Commitment Period," and is now numbered 122C-1. This form carried the number 22C-1 prior to December 1, 2015, when the official forms were modernized. Sean and Melinda filed their petition before the new forms came into effect.

6

*A. Sean and Melinda's PP payments are SSA benefits*

The trustee argues that the PP payments Sean and Melinda receive on behalf of Christian are not benefits received under the SSA. The trustee focuses on the phrase "benefits received under." ECF Doc. No. 33 at 3–7. The Court disagrees with the trustee's interpretation of the phrase "benefits received under" and concludes the PP payments Sean and Melinda receive on behalf of Christian are benefits received under the SSA.[13]

Section 101(10A) excludes from current monthly income "benefits received under the Social Security Act." A natural reading of the phrase "benefits received under the Social Security Act" is to replace "Social Security Act" with the relevant sections of Title 42 of the United States Code.[14] *Accord In re Adinolfi*, 543 B.R. 612, 619 (B.A.P. 9th Cir. 2016). Given the wide variation in the programs authorized under the SSA and in particular how benefits under the programs are administered and funded, courts have struggled to decipher whether all benefits authorized by the SSA are "benefits received under" the SSA. *See id.* at 615–19 (discussing differing ways courts have interpreted the section 101(10A)(B) exclusion and describing the broad array of programs that are codified within the expanse of the SSA). The Court need not resolve whether all payments made under programs established under this statutory scheme are "benefits received under" the SSA. The only issue before the Court is whether the PP payments to Sean and Melinda are excluded from current monthly income as benefits received under the SSA or are otherwise excluded from disposable income.

The bankruptcy appellate panel in *Adinolfi* faced a question related to the present case. The narrow issue in *Adinolfi* was if adoption assistance payments the debtor received through the

---

[13] This is a question of first impression. Neither the parties' counsel nor the Court found a published opinion on this issue.

[14] The Social Security Act is codified at 42 U.S.C. §§ 301–1397mm.

7

Adoption Assistance and Child Welfare Act of 1980, designed to encourage adoption of children with special needs (collectively "adoption assistance payments"), qualified as benefits under the SSA and accordingly were excluded from current monthly income under section 101(10A). *Id.* at 613.

The adoption assistance payments and the Medicaid waiver benefits are administered in similar ways. Like Medicaid waiver benefits, adoption assistance payments fall under the umbrella of the SSA. *Id.*; *see also* 42 U.S.C. §§ 670–676 (providing adoption assistance payments eligibility guidelines). Both Medicaid waiver benefits and adoption assistance payments are paid out through state agencies, with the federal government covering at least 50% of the cost. *Compare* 42 U.S.C. § 674 (presenting federal portion of adoption assistance payments, which range from 50% to 80%), *with id.* § 1396d(b) (setting forth criteria for federal portion of Medicaid cost, which "shall in no case be less than 50 per centum or more than 83 per centum").

After examining the language of the relevant statutes and the purpose of the adoption assistance payments, the panel determined that these payments were excluded from the debtor's disposable income. *Adinolfi*, 543 B.R. at 619. The trustee in *Adinolfi* volleyed six policy and statutory interpretation arguments in support of his position, all of which the panel rejected. *Id.* at 620–23. The trustee raises many of the same arguments in this case. This Court finds *Adinolfi*'s analysis persuasive and holds that the same outcome is appropriate in the narrow dispute before it.

> 1. PP payments are made by a state-approved entity and not Medicaid, but this does not affect their status as Medicaid waiver benefits

The trustee argues that Sean and Melinda do not receive SSA benefits because they do not receive any money directly from Medicaid or the federal government. While it is true that

8

Public Partnership issues the PP payments, the trustee's reliance on which entity cuts Sean and Melinda a check is misplaced. *See Adinolfi*, 543 B.R. at 621 (rejecting identical "follow the money" argument). As *Adinofli* explained, the key flaw in this line of reasoning is that it forces the Court to add words to section 101(10A)(B), changing the language to "benefits received **from the federal government** under the Social Security Act." *Adinolfi*, 543 B.R. at 622 (emphasis in original); *see also id.* at 616 (rejecting contention that "benefits received under the Social Security Act" means said benefits must be "under the **exclusive** control" of the SSA) (emphasis in original); *id.* at 623 ("Nothing in the words of the statute suggests that the SSA must be the exclusive source of authority for the benefits program."). It is up to Congress to change the statutory language if it intended the SSA exclusion to apply only to funds disbursed by the federal government. *See also id.* at 616–19 (emphasizing nearly all programs authorized by SSA are jointly funded and operated by federal and state governments, and most contemplate some degree of state involvement).

One way to illustrate the illogical outcome that would result from adopting the trustee's interpretation is through the federal government's supplemental security income for the aged, disabled, and blind ("SSI"). 42 U.S.C. §§ 1381–1383(f). States that provide an SSI supplement have the option of managing the program on their own or having the Social Security Administration process the payments together with the federal amount. *Id.* § 1382(e). The Commonwealth of Virginia provides a state supplement through an auxiliary grants program for SSI recipients who live in licensed assisted living facilities, adult foster care homes and other authorized forms of supportive housing. Va. Code § 51.5-160. Virginia is one of the states that elects to self-administer its state supplement. *Id.* The trustee's characterization of "benefits received under," would require the Court to find that Virginia's SSI state supplement is current

monthly income (and consequently disposable income) when Virginia issues the payments, and at the same time find that the payments are not current monthly income if Virginia asked the Social Security Administration to process the state supplement payments. The Court is not convinced that the statutory language requires this distinction and to interpret the language in this manner leads to illogical outcomes.[15] *Accord Adinolfi*, 543 B.R. at 621 (explaining debtor's ability to pay creditors and whether she receives a benefit under the SSA is not controlled by who processes her check, and concluding that a contrary ruling leads to an irrational outcome).

### 2. Illusion of caregiver choice in the family context

The trustee next relies on the fact that Cristian has the choice[16] of hiring someone other than his parents as his care provider through Public Partnership. The trustee points out that Christian is the real recipient of the Medicaid waiver benefits, and, in effect, employs his parents through Public Partnership. The fact that Christian selected his parents, the trustee asserts, should not be treated differently than if he asked Public Partnership to send somebody else.[17] For this reason, the trustee maintains that if the PP funds are excluded, they are excluded only as to Christian. The trustee's suggestion that Christian has a choice and has employed his parents at his will is not supported by the facts.

More to the point, the choice to live in the parent's home, once a child has reached majority age, is not the child's decision. The parents have permitted their severely disabled adult child to live in their home in lieu of admitting him to an institution. Not only that, Sean and

---

[15] The trustee's characterization would, for example, result in the inability to reconcile the definition of current monthly income for Virginia debtors receiving SSI with California debtors receiving SSI. *See* Cal. Wel. & Inst. Code § 12100 (choosing to have Social Security Administration make California's state supplement payments).

[16] Christian lacks the cognitive capacity to make this decision, but this is irrelevant because Medicaid waiver benefits are not limited to adults with intellectual disabilities.

[17] This would, of course, eliminate any disposable income issue because the PP funds would never pass through Sean and Melinda. In the event a third party assisted with Christian's care, Public Partnership would pay the third party directly.

Melinda are providing the care for their disabled son. The PP payments to Sean and Melinda reflect both these criteria, and this separates Sean and Melinda from a third-party caregiver whom Public Partnership hires to work with a qualified beneficiary in someone else's home on an hourly basis. For Sean and Melinda, caring for Christian is not a day job; it is their life. The Court holds that, for Sean and Melinda, the PP payments are benefits received under the SSA that are excluded from their disposable income.

The trustee also equates Sean and Melinda to a physician who is compensated by Medicaid. If the doctor cannot exclude Medicaid compensation from disposable income, the trustee asserts Sean and Melinda should not be able to do so either. The Court's reply to this analogy is straightforward: for Sean and Melinda the PP payments are excluded because they are payments to personally care for Christian in their home to avoid placing Christian in a hospital, nursing facility or like institution. As explained previously, these criteria classify the PP payments at issue as Medicaid waiver benefits. Medicaid payments to a doctor are a form of income that does not share this purpose, and the comparison is inapplicable to the circumstances before the court.

### 3. Effect on pending cases

The trustee raised a concern during oral argument that a ruling in favor of Sean and Melinda would boil over into multiple pending cases in which debtors work for Public Partnership. At present, no other contested matters before this Court match the facts and circumstances of this case. At first blush it may appear difficult to distinguish payments through the Medicaid waiver program to a debtor who is providing personal care to a qualified beneficiary in her own home, from compensation to a debtor whom Public Partnership hires to spend a set number of hours per week working as a health aide in someone else's residence.

Upon closer inspection, the distinction is simple. The payments to avoid institutionalization require that the qualified beneficiary live with the care provider. The exceptional personal sacrifice and commitment by such care providers may render these circumstances a rarity. This may also explain the lack of reported cases addressing the use of these payments as disposable income for the benefit of the care provider's unsecured creditors.

For all of the above reasons, the Court finds that the PP payments Sean and Melinda receive are excluded from their disposable income as benefits received under the SSA.

### B. *Sean and Melinda's PP payments are excluded foster care payments*

The parties spent the bulk of their time addressing whether the PP payments are excluded as SSA benefits, but the Court construes one of the trustee's arguments as challenging whether Sean and Melinda's PP payments are protected foster care payments pursuant to section 1325(b)(2). *See* Tr.'s Br., ECF Doc. No. 33 at 1 n.1 (noting Medicaid waiver benefit "exclusion [from taxation under nonbankruptcy law] may only apply to foster care providers"); *see also* § 1325(b)(2) (excluding "foster care payments" from disposable income). Should the Court find that the PP payments are section 1325(b)(2) foster care payments, this would be an independent reason to exclude the PP payments from Sean and Melinda's disposable income—regardless of whether they are SSA benefits. Although the Bankruptcy Code excludes foster care payments from disposable income, it does not define "foster care payments." To determine if these PP payments are foster care payments within the meaning of 1325(b), the Court will consider how foster care payments are interpreted under nonbankruptcy law.

The Internal Revenue Service ("IRS") historically taxed care providers on Medicaid waiver program income unless the care provider was a foster parent who received "difficulty of care payments." Difficulty of care payments are defined as compensation to a foster care provider for providing care "(i) required by reason of a physical, mental or emotional handicap

12

of [an] individual with respect to which the State has determined that there is a need for additional compensation, *and (ii) provided in the home of the foster care provider*." 26 U.S.C. § 131(c)(1) (emphasis added); *see also id.* § 131(a) (excluding qualified foster care payments from taxable income); I.R.S. Notice 2014-7, 2014-4 I.R.B. 445, 445–46 (discussing history of foster care payments exclusion). As a result, individuals who provide live-in care to qualified beneficiaries but who are not foster care providers pay income taxes on money received through the Medicaid waiver program.

On January 3, 2014, the IRS determined Medicaid waiver program payments to all care providers who live with the qualified beneficiary are excluded from taxable income regardless of "whether the care provider is related or unrelated to the eligible individual." I.R.S. Notice 2014-7, 2014-4 I.R.B. at 446. By doing so, the IRS expanded the definition of a qualified foster care provider to include people who receive difficulty of care payments through a Medicaid waiver program for providing "nonmedical support services . . . to an eligible individual (whether related or unrelated) living in the individual care provider's home." *Id.*; *see also* 26 U.S.C. § 131(b)(1)(B) (including difficulty of care payments in the definition of qualified foster care payments); 42 U.S.C. § 1396(n)(c) (expanding "medical assistance" for the purposes of the Medicaid waiver program to include various nonmedical support services, such as home- and community-based services and habilitation services); ECF Doc. No. 29-2 at 2 (categorizing Christian as receiving "Personal Attendant" and "Companion Services" through the Medicaid waiver program); ECF Doc No. 33-1 at 1 (disclosing on Melinda's Public Partnership pay advice document the following service categories: attendant care services, companion services and respite services).

13

Foster care payments are not limited to non-biological parents. *See* 26 U.S.C. § 131; I.R.S. Notice 2014-7, 2014-4 I.R.B. at 446. Although not controlling, the Court recognizes the treatment of "foster care payments" by the Internal Revenue Service and in particular the IRS's acknowledgement that there are no substantive differences between birth and foster parents who personally care for disabled adult children in their own homes.

Applying the language of 26 U.S.C. § 131, the PP payments Sean and Melinda receive are foster care payments. Because a qualified foster care provider may be a biological parent, Sean and Melinda are Christian's foster care providers for purposes of Medicaid waiver benefits. Virginia, through Public Partnership and in collaboration with Medicaid, allocates PP payments to Christian so that his parents can provide him with nonmedical support services in their own home. The PP payments thus meet all the requirements of difficulty of care payments. Under these facts, the Court is convinced that the PP payments are foster care payments excluded from Sean and Melinda's disposable income.[18] *See* § 1325(b)(2) ("[T]he term "disposable income" means current monthly income received by the debtor (other than . . . foster care payments . . . ) less amounts reasonably necessary to be expended . . . .").

## CONCLUSION

For the foregoing reasons, the Court overrules the trustee's objection to confirmation of the debtors' plan, and denies the trustee's request to compel Sean and Melinda to amend Official Form 22C-1, Schedule I, and their chapter 13 plan. The Court will contemporaneously issue an Order consistent with the findings and ruling of this Memorandum Decision.

---

[18] Sean and Melinda were not aware of IRS Notice 2014-7 when they filed their tax return for 2015. Sean and Melinda disclosed PP payments as gross income and received a large tax refund. Because the Court finds that the PP payments are excluded from disposable income either as SSA benefits or foster care payments, any accompanying refund that stems from PP payments is also excluded from disposable income.

14

The Clerk is directed to send electronic notification of the entry of this Memorandum Decision to the trustee and counsel for the debtors.

Entered: September 6, 2016

/s/ Rebecca B. Connelly
Rebecca B. Connelly
U.S. Bankruptcy Judge